## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SETH M. COTNER, | : | |
| | : | |
| **Plaintiff** | : | **Civil Action No. 1:07-cv-1566** |
| | : | |
| v. | : | **(Chief Judge Kane)** |
| | : | |
| RANDALL W. YOXHEIMER et al., | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the Court are Defendants' motion to dismiss (Doc. No. 8) Plaintiff Seth M. Cotner's complaint, Defendants' brief in support thereof (Doc. No. 9), Plaintiff's brief in opposition (Doc. No. 13), and Defendants' brief in reply (Doc. No. 16).  For the reasons that follow, the Court will grant Defendants' motion to dismiss the complaint in its entirety.

## I.    BACKGROUND

On or about March 30, 1993, Defendant Point Township hired Plaintiff Seth M. Cotner as a full-time patrol officer.  (Compl. ¶ 12.)  At the time of Plaintiff's hiring, the chief of police was Gary Steffen, a popular public figure who "had a history of standing up to the [Point Township Board of] Supervisors in matters related to the Police Department and its personnel."  (Id. ¶¶ 13, 22, 90; see id. ¶¶ 91, 92.)  Steffen's independence "displeased the Supervisors who desired to have more of a 'yes man' in the position of Police Chief."  (Id. ¶ 23.)

After several years of exemplary performance and upon Steffen's recommendation, the Defendant Point Township Board of Supervisors ("Supervisors") promoted Plaintiff to the position of Sergeant.  (Id. ¶ 14.)  As sergeant, Plaintiff's responsibilities included supervising three patrol officers, reviewing and approving reports, implementing and maintaining the duty schedule, and serving as officer-in-charge when Steffen was absent.  (Id. ¶ 15.)  In addition,

Plaintiff served as both the field supervisor for the Northumberland Montour Drug Task Force and the D.A.R.E. instructor for the Shikellany Area School District.  (Id. ¶¶ 16-17.)  Steffen, for his part, held Plaintiff in such high regard that he began to "groom" Plaintiff as his eventual replacement.  (Id. ¶¶ 18, 24; see id. ¶ 93.)

On or about June 2005, Steffen gave Point Township notice of his intention to retire.  (Id. ¶ 19.)  Steffen worked for seven additional days in order that his accrued sick, vacation and holiday time could carry him to twenty-eight years of service.  (Id.)  As was its custom, Point Township "paid salary and benefits to [Steffen] on regular paydays up to his payroll retirement date."  (Id. ¶ 20.)  Steffen recommended that, upon his departure, Plaintiff be named acting chief of police.  (Id. ¶ 21.)  The Supervisors declined, however, and instead named Plaintiff to the lesser position of officer-in-charge.  (Id.)  According to Plaintiff, the Supervisors were motivated by the knowledge "that [Plaintiff] had been groomed by [Steffen] . . . and that Steffen associated with [Plaintiff] outside of work."  (Id. ¶ 24; see id. ¶¶ 93, 94.)

Following Steffen's retirement, Defendants Randall Yoxheimer and Montie Peters held a series of "secret meetings" with Defendant Curt Brown, then a patrolman, "to insure that Brown would become the next chief of police."  (Id. ¶ 27; see id. ¶ 119.)  In furtherance of their goal, the aforementioned defendants "agreed that it would be necessary to discredit [Plaintiff] or force him to resign because [Plaintiff] was clearly more qualified for the position of Police Chief than Patrolman Brown . . . ."  (Id. ¶ 28; see id. ¶¶ 98, 119.)

Point Township ran advertisements for Steffen's replacement in two newspapers and received approximately seven applications.  (Id. ¶ 29.)  However, none of the applicants were granted interviews.  (Id. ¶ 30.)  The Supervisors interviewed Plaintiff on November 11, 2005,

telling him that his was "the most impressive application they had ever received." (Id. ¶ 33.)  At no time during the interview did the Supervisors question Plaintiff's ability or fitness to serve as chief of police.  (Id.)  Nevertheless, "[p]rivate negotiations between Defendants Yoxheimer, Peters, and Brown continued until the [f]all of 2005, when, after the Township supervisors had completed interviews of members of the Police Department, Defendant [sic] Yoxheimer and Peters informed the remaining supervisors that Curt Brown would be the new Chief of Police because it was already a done deal and Seth Cotner was to be forced to leave the department." (Id. ¶ 122; see also ¶¶ 31, 120.)  Rather than put a stop to these meetings, the other Supervisors simply "acquiesced in the malicious plans of Defendant [sic] Yoxheimer and Peters." (Id. ¶ 121.)

On November 14, 2005, the Supervisors and Point Township's solicitor summoned Plaintiff to a "closed-door" meeting.  (Id. ¶ 35.)  During this meeting, the "Supervisors made numerous false and baseless allegations against [Plaintiff], including accusing him of alcoholism and threats of violence against his ex-wife," and "threatened to terminate [Plaintiff's] employment based on charges unbecoming an officer unless he agreed, at that very moment, to take an administrative leave effective immediately." (Id. ¶¶ 36-37; see id. ¶ 125.)  Yoxheimer assured Plaintiff that "after the administrative leave expired if he simply left the Point Township Police Department nothing would be placed in his personnel file." (Id. ¶ 41.)  When Plaintiff asked if he could consult with an attorney and respond to their request the following day, the "Supervisors told him that if he did not take the administrative leave at that meeting, charges would be prepared and they would begin the process of terminating his employment." (Id. ¶ 38.) "Feeling he had no other choice and desiring only to clear his name," Plaintiff agreed to take

administrative leave.  (<u>Id.</u> ¶ 39.)  The solicitor promptly produced the necessary paperwork,

which Plaintiff proceeded to sign.  (<u>Id.</u> at 40.)  As the meeting drew to a close, the Supervisors

advised Plaintiff to "give consideration to finding other employment because he would likely

feel uncomfortable working under the new Chief of Police because they were preparing to

announce the appointment of Patrolmen Curt Brown to the position of Chief of Police that very

evening."  (<u>Id.</u> ¶ 40.)

No sooner had the Plaintiff taken leave than "Point Township confiscated all Police

Department property in his possession and even requested his MOPEC card."[1]  (<u>Id.</u> ¶ 42.)

According to Plaintiff, Point Township was unusually thorough in this regard "because the

[Supervisors] had no intention of allowing [Plaintiff] to return to duty."  (<u>Id.</u> ¶ 43.)  Although

Plaintiff "made every effort" to comply with Point Township's request that he undergo a

psychiatric evaluation, the latter repeatedly extended Plaintiff's leave by "refusing to accept

evaluations obtained by him."  (<u>Id.</u> ¶ 45.)  Ultimately, however, Dr. Anthony Butto evaluated

Plaintiff over the course of three days in February 2006, and declared Plaintiff "fit for duty."

(<u>Id.</u> ¶ 46-47.)  In his report to the Supervisors, Butto stated that Plaintiff "was a social drinker

who clearly had no problem with alcohol, and that psychological testing revealed that Sergeant

Cotner was not prone to violent behavior."  (<u>Id.</u> ¶ 47; <u>see id.</u> ¶¶ 126, 127.)  "Notably," Plaintiff

adds, "the Defendants were perfectly capable, at any time, of contacting [Plaintiff]'s ex-wife

regarding their allegations of threatening conduct . . . , but did not do so because they knew the

allegations to be false."  (<u>Id.</u> ¶ 48.)

---

[1] Despite placing great emphasis on Plaintiff's "MOPEC" card, neither party defines the acronym or describes the purpose of such a card in their briefs.  The Court therefore expresses no opinion as to the import or lack thereof of any alleged "MOPEC" card.

4

In light of Butto's report, the Supervisors had "no choice" but to allow Plaintiff to return

to work, and, on March 14, 2006—approximately four months after taking leave—Plaintiff

resumed his duties as sergeant.  (Id. ¶ 49.)  This was preceded, however, by another closed-door

meeting with the Supervisors, during which Plaintiff was "admonished not to come to the

Supervisors about problems with the Police Department despite the fact that he had never done

[so] in the past."  (Id. ¶ 50.)  The Supervisors also informed Plaintiff "that his every other

weekend schedule would be opposite to what it was prior to his leave," knowing full well that

this new schedule would interfere with Plaintiff's existing child custody arrangements.

(Id. ¶¶ 50-51.)  The "Supervisors and Chief Brown refused to consider changing the schedule

despite the fact that [Plaintiff] provided several easy solutions to the problem."  (Id. ¶ 51.)

Without naming those responsible, Plaintiff expansively avers that, upon returning from

leave, "all of [his] duties and responsibilities were stripped."  (Id. ¶ 52.)  More particularly,

Plaintiff alleges that he was "required to work far more night shifts than any other officer in the

department," (id. ¶ 64), and, "[w]hile other officers were permitted to take a police vehicle home

on off days, [he] was not permitted to do so," (id. ¶ 61).  Plaintiff further alleges that Brown

> took administration of the D.A.R.E. Program away from [him] by
> falsely and baselessly accusing [him] of attending school functions
> smelling of alcohol, . . . took all scheduling responsibilities away
> from [him,] . . . removed [his] name from the "approved" section of
> reports and replaced it with his own name, . . . removed all
> responsibilities for the evidence room from [him,] . . . took [his]
> computer and, as a result, [he] had no operable computer at his desk
> [and,] . . . [w]ould not permit [him] to attend any classes, seminars or
> continuing education.

(Id. ¶¶ 53, 56-61.)  Additionally, Brown "made it clear to [Plaintiff] that he would not tolerate

any attempt [by Plaintiff] to exercise, supervisory or authority [sic] over subordinates, to that

end, [sic] when [Plaintiff] provided [Brown] with evidence that a patrol officer had falsely submitted and [sic] overtime slip, [Brown] chastised and reprimanded [Plaintiff], instead of conducting a good faith investigation of the charges." (Id. ¶ 63.)  Lastly, when the mayor of nearby Sunbury, Pennsylvania, requested Plaintiff's assistance in selecting a "K9 officer" for the city's police department, Brown and the Supervisors denied Plaintiff permission to do so. (Id. ¶ 62.)

Both during and after Plaintiff's leave, the Supervisors and Brown "disseminated false information to members of the public to the effect that [Plaintiff] was a drunk who had threatened harm against his his [sic] ex-wife." (Id. ¶ 65; see id. ¶¶ 128, 130.)  Moreover, when Plaintiff inquired with Brown as to the source of the accusation that he smelled of alcohol while attending school functions, Brown, "who had falsely created the [accusation] himself, refused to provide any information, saying it was an anonymous source." (Id. ¶ 54; see id. ¶ 129.) Plaintiff, however, took steps to "verif[y] that no teachers had made any such complaints" and, "[a]s a matter of fact, all of the school teachers who had dealt with [him] with respect to the D.A.R.E. [p]rogram had formally recommended him for the position of Chief." (Id. ¶ 55.)

On May 22, 2007, Plaintiff gave Point Township notice of his intention to "exercis[e] his right under the Collective Bargaining Agreement to accept the early vested retirement option," thereby using his accrued sick, vacation, and holiday time to carry him to an effective retirement date of April 6, 2008.[2] (Id. ¶ 69.)  According to Plaintiff, he had intended to remain with the

---

[2] Despite repeated references to the "Collective Bargaining Agreement," neither party provides the Court with its relevant provisions or includes the agreement as an exhibit to any filing.  The Court therefore expresses no opinion as to the import or lack thereof of any alleged collective bargaining agreement.

police department until his voluntary retirement date, "but the actions of the Defendants created working conditions which were so intolerable that he was forced to resign."  (Id. ¶ 68; see id. ¶¶ 94, 98, 104.)  Point Township paid Plaintiff his salary and benefits for regular paydays from May 23, 2007, through June 5, 2007.  (Id. ¶ 71.)  On May 31, 2007, Point Township cancelled Plaintiff's health insurance benefits (id. ¶¶ 74, 114) and, on June 21, 2007, contrary to Plaintiff's wishes, Point Township paid Plaintiff the balance of his salary and benefits in a lump sum, effectively reducing his pension and depriving him of "years of credited service" (id. ¶¶ 73, 115).

## II.     STANDARD OF REVIEW

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) is properly granted when, accepting all factual allegations and inferences as true, the moving party is entitled to judgment as a matter of law.  Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990).  Although the moving party bears the burden of showing that no claim has been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2007), the complaint must allege facts sufficient to "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)," Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (citations omitted).  Moreover, in order to satisfy federal pleading requirements, a plaintiff's obligation "to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (brackets and quotation marks omitted) (quoting Twombly, 127 S. Ct. at 1964-65).

## III.    DISCUSSION

For reasons of clarity and economy, the Court will address each of the nine counts of Plaintiff's complaint in the following non-sequential order:  Count III, violation of Plaintiff's First Amendment right of association; Count V, wrongful discharge; Count VII, violations of the Pennsylvania Wage Payment and Collection Law; Count VIII, violations of the Pennsylvania Sunshine Act; Count VI, commission of an intentional tort as set forth in the Restatement (Second) of Torts § 870; Count I, violation of Plaintiff's substantive due process rights; Count II, violation of Plaintiff's procedural due process rights; Count IV, conspiracy in violation of 42 U.S.C. § 1983; and Count IX, defamation.

### A.      Count III: Violation of Plaintiff's First Amendment Right of Association by the Supervisors

In Count III of his complaint, Plaintiff argues that his "close association with former Chief Steffen was a motivating factor in the Defendants [sic] decision to force Plaintiff to take a leave of absence, discredit him in the community, and make his working conditions so intolerable that he was forced to resign."  (Compl. ¶ 94.)  The Supervisors charge that Plaintiff's failure to allege that he engaged in any constitutionally protected conduct, such as supporting a particular political party or candidate, is fatal to his claim.  (Doc. No. 9, at 22-23.)  In his brief in opposition, Plaintiff brings his First Amendment argument into slightly sharper focus, explaining that "it was Plaintiff's close association with former Chief Steffen, the political rival of the Supervisors on matters related to the Police Department which was a motivating factor in the Defendants' decision."  (Doc. No. 13, at 15.)  Quoting the Third Circuit Court of Appeal's decision in Bennis v. Gable, 823 F.2d 723 (3d Cir. 1987), Plaintiff fleetingly asserts that "[a] citizen's right not to support a candidate is every bit as protected as his right to support one," id. at 731, and that the Supervisors "were not free to force him into taking an administrative leave,

"defacto demoting him from his position of Sargent [sic], and constructively discharging his employment, because of his close association with the former Chief and their preference to hire Brown." (Doc. No. 13, at 16.)  Nevertheless, Plaintiff "acknowledges the right of the individual Defendants' [sic] Supervisors to choose whomever they desire to serve as Chief of the Point Township Police Department."  (Id., at 15-16.)

"The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate."  Rutan v. Republican Party of Illinois, 497 U.S. 62, 76 (1990).  The United States Supreme Court has recognized a constitutionally protected freedom of association in two distinct contexts.  In one line of decisions, the Court has concluded that the right to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the state.  See Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984).  Intimate human relationships in this context are "those that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives."  Id. at 619 (citations omitted).  In another line of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment, including speech, assembly, petition for the redress of grievances, and the exercise of religion.  See id. at 618.  The right of association recognized in the latter line of cases has generally involved "membership in a particular political party or support of a particular political party or candidate."  See Cuffeld v. Supreme Court of Pennsylvania, 936 F. Supp. 266, 277 (E.D. Pa. 1996) (collecting cases).

Plaintiff in this case fails to allege that he engaged in any sort of constitutionally protected conduct.  While he and Steffen "enjoyed a close relationship both in and outside of the work place," it was not the sort of "intimate human relationship" contemplated by the caselaw. Plaintiff did not engage in any ongoing protected associational activity; he simply "befriend[ed] an alleged former rival of the Supervisors."  (Doc. No. 16, at 8.)  Furthermore, the complaint is devoid of any allegation that Plaintiff suffered for his support of a particular political party or candidate for office.  There was no election and, therefore, no candidates.  Steffen resigned as chief of police and the Supervisors exercised their prerogative to appoint a "yes man" to the post. As Plaintiff notes, his right not to support a candidate—which Steffen, having resigned, was not—"is every bit as protected as his right to support one."  Bennis, 823 F.2d at 731 (citing Roberts, 468 U.S. at 623).  However, inasmuch as the plaintiffs in Bennis had supported the losing candidate in a sharply contested mayoral election, any analogy thereto is entirely inapposite.  Accordingly, the Court will dismiss Count III of the complaint.

### B.    Count V: Wrongful Discharge by Point Township

In his brief in opposition, Plaintiff concedes that the Political Subdivision Tort Claims Act, 42 Pa. Con. Stat. § 8541 (2007), bars his wrongful-discharge claim against Point Township. See id. ("[N]o local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."). Accordingly, the Court will dismiss Count V of the complaint.

### C.   Count VII: Violations of the Pennsylvania Wage Payment and Collection Law by Point Township

Plaintiff likewise concedes that the Pennsylvania Wage Payment and Collection Law does not extend to municipal corporations such as Point Township.  (Doc. No. 13, at 19.)  <u>See also</u> <u>Gallaher v. Goldsmith</u>, 213 F. Supp.2d 496 (E.D. Pa. 2002) (citing cases) ("Municipal corporations are not included in [the act's] definition [of "employer"] and therefore courts have determined that the PWPCL does not apply to entities such as boroughs, school districts, and counties.").  Accordingly, the Court will dismiss Count VII of the complaint.

### D.   Count VIII: Violation of the Pennsylvania Sunshine Act by Peters, Yoxheimer, and Brown

In Count VIII of his complaint, Plaintiff alleges that Peters and Yoxheimer "secretly negotiated" with Brown "until the Fall of 2005" in violation of Pennsylvania's Sunshine Act. (Compl. ¶¶ 119-20.)  The Sunshine Act provides in pertinent part that, "in the case of a meeting which was not open, no legal challenge may be commenced more than one year from the date of said meeting."  65 Pa. Con. Stat. § 713 (2007).  Because the Supervisors announced the appointment of Brown to chief of police on November 14, 2005, any alleged violation of the act necessarily occurred prior to that date.  (Compl. ¶ 40.)  Plaintiff filed his complaint on August 27, 2007, well after the statute of repose had run.  <u>See</u> <u>Lawrence County v. Brenner</u>, 582 A.2d 79, 82 (Pa. Commw. Ct. 1990) ("[Section 713] provides a one year statute of repose for actions alleging violations of the Act at meetings not open to the public.")  Accordingly, the Court will dismiss Count VIII of the complaint.

E.     Count VI: Commission of an Intentional Tort as Set Forth in the
       Restatement (Second) of Torts § 870 by All Defendants

In Count VI of his complaint, under the heading "Intentional Tort Restatement (2nd) of

Torts § 870," Plaintiff claims that the "actions of the individual Defendants, as set forth above,

as agents and/or employees of Defendant Point Township, are intentional acts which were

unjustified and culpable and which caused harm to the legally protected interests of Plaintiff Seth

Cotner in his employment."  (Compl. ¶ 109.)  The cause of action of intentional or "prima facie"

tort appears in Section 870 of the Restatement (Second) of Torts, which provides that "[o]ne who

intentionally causes injury to another is subject to liability to the other for that injury, if his

conduct is generally culpable and not justifiable under the circumstances."  Restatement

(Second) of Torts § 870.  However, as Defendants correctly contend, neither the Pennsylvania

Supreme Court nor any other court interpreting Pennsylvania law has recognized an independent

claim for intentional tort.  See Marshall v. Fenstermacher, 388 F. Supp. 2d 536, 558 (E.D. Pa.

2005); D'Errico v. DeFazio, 763 A.2d 424, 433 (Pa. Super. Ct. 2000).  "The only exceptions to

this are a few federal district courts that have permitted litigants to maintain prima facie tort

claims under Pennsylvania law." utz v. Johnson, 2004 WL 1368824, at *2 (E.D. Pa. Jun. 16,

2004) (noting that "[s]ome of these courts have allowed prima facie tort claims without any

analysis or citation.").  By contrast, the great majority of federal district courts, several of which

engaged in a lengthy examination of the issue not to be repeated here, have uniformly concluded

that the Pennsylvania Supreme Court would not recognize such a cause of action under

Pennsylvania law.  See, e.g., Garland v. US Airways, Inc., No. 05-140, 2006 WL 2927271, at *4

(W.D. Pa. Oct. 11, 2006); Marshall, 388 F. Supp. at 558; utz, 2004 WL 1368824, at *2-3;

Internet Billions Domain v. Venetian Casino Resort, LLC, 2002 WL 1610032, at *1-2 (E.D. Pa.

May 31, 2002); <u>Charles Shaid of Pennsylvania, Inc. v. George Hyman Const. Co.</u>,

947 F. Supp. 844, 855 (E.D. Pa. 1996).

In his brief in opposition, Plaintiff contends that, "in the face of no appellant [sic]

decision affirmatively rejecting a cause of action pursuant to Section 870 and the Superior

Court's decision in <u>Smith v. Griffiths</u>, affirmatively recognizing such a cause of action, this

Court should recognize the existence of Section 870 claims Pennsylvania Law."  (Doc. No. 13,

at 19 (citing <u>Smith v. Griffiths</u>, 476 A.2d 22, 27 (Pa. Super. Ct. 1984)).)  More accurately, the

Pennsylvania Superior Court expressed no opinion in <u>Smith</u> as to whether Pennsylvania law

recognized an independent claim for an intentional tort.  <u>Smith</u>, 476 A.2d at 27.  Rather, after

enumerating the elements of such a claim, the court concluded, without fanfare, that "the

averments of [the plaintiff's] complaint d[id] not disclose an intentional tort."  <u>Id.</u>  Sixteen years

later, that same court had occasion to observe that "Pennsylvania has not yet adopted intentional

or prima facie tort as set forth in § 870 of the Restatement . . . ."  <u>D'Errico v. DeFazio</u>, 763

A.2d 424, 433 (Pa. Super. Ct. 2000).  Because intentional tort is not a cognizable legal theory in

Pennsylvania, the Court will dismiss Count VI of Plaintiff's complaint.

**F.**    **Count I: Violation of Plaintiff's Substantive Due Process Rights by the Individual Defendants**

In Count I of his complaint, Plaintiff asserts that he "had a property interest in his

employment as a police officer" (Compl. ¶ 78) and alleges that the individual defendants

violated his substantive due process rights "by failing to provide him with written notification of

any charges against him[,] forcing him to accept a medical leave of absence[, and] by making his

working conditions so intolerable that he was forced to resign his employment" (<u>id.</u> ¶¶ 79-80).

The individual defendants, on the other hand, argue that "Plaintiff [was] a public employee and not entitled to substantive due process protection."  (Doc. No. 9, at 18.)

As the Third Circuit succinctly explained in Hill v. Bor. of Kutztown, 455 F.3d 225 (3d Cir. 2006):

> "To prevail on a substantive due process claim challenging a state actor's conduct, 'a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies.'  Whether a property interest is protected for purposes of substantive due process is a question that is not answered by reference to state law.  Rather, for a property interest to be protected for purposes of substantive due process, it must be 'fundamental' under the United States Constitution.  This court has held explicitly that public employment is not a fundamental right entitled to substantive due process protection."

Id., 455 F.3d at 235 n.12 (citing Nicholas v. Pennsylvania State Univ., 227 F.3d 133, 139-140 (3d Cir. 2000)).  Plaintiff's failure to establish that he had a protected property interest worthy of substantive due process protection is fatal to his claim.  Nicholas, 227 F.3d at 139-40.

Accordingly, the Court will dismiss Count I of Plaintiff's complaint.

### G.   Count II: Violation of Plaintiff's Procedural Due Process Rights by the Individual Defendants

Across five brief paragraphs in Count II of his complaint, wherein the generally distinct concepts of procedural and substantive due process are freely mingled to debilitating effect, Plaintiff alleges the following:

> By virtue of Procedural Due Process Rights secured by the Fourteenth Amendment of the United States Constitution, a State or Local Government may not infringe a property interest encompassed by the Fourteenth Amendment.  Defendants' [sic] denied Plaintiff is [sic] substantive due process rights by failing to provide him with written notification of charges against him and forcing him to take a leave of absence from his employment without just cause.

14

> Defendants' denied Plaintiff his substantive due process right by
> making his working conditions so intolerable that he was forced to
> resign.

(Compl. ¶¶ 84-86.)  Arguing for dismissal, the individual defendants assert that, as a preliminary

matter, "Plaintiff has failed to allege or to identify the basis, if any, of his protected property

interest which triggers any procedural due process guarantees."  (Doc. No. 9, at 12.)  The Court

agrees.  Although Plaintiff attempts to bring some much needed clarity to the foregoing

statements by way of his opposing brief, "the legal theories set forth in [a plaintiff's] brief are

helpful only to the extent that they find support in the allegations set forth in the complaint."

Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988).  In this case,

Plaintiff's theories find no such support.  Indeed, even the most generous reading of the

complaint fails to save his claim.

Presumably, Plaintiff brings his claim under 42 U.S.C. § 1983, which, while not itself a

source of substantive rights, provides a cause of action for the deprivation of federally protected

rights by persons acting under color of state law.  See 42 U.S.C. § 1983.  "To establish liability

under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law,

violated the plaintiff's federal constitutional or statutory rights, and thereby caused the

complained of injury."  Elmore v. Cleary, 399 F.3d 279, 281 (3d Cir. 2005).  The Fourteenth

Amendment to the United States Constitution prohibits deprivations "of life, liberty, or property,

without due process of law."  U.S. Const. amend. XIV, § 1.  To have a property interest in a

position of employment, a person "must have more than a unilateral expectation of it[; h]e must,

instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth,

408 U.S. 564, 577 (1972).  Whether such a property interest exists is a question of state law.  See Elmore, 399 F.3d at 282.

Under Pennsylvania's Police Tenure Act ("Act"), a second-class township such as Point Township may not suspend, remove, or reduce in rank any "full-time police officer except for the following reasons: (1) physical or mental disability . . . ; (2) neglect or violation of any official duty; (3) violating of any law which provides that such violation constitutes a misdemeanor or felony; (4) inefficiency, neglect, intemperance, disobedience of orders, or conduct unbecoming an officer; [or] (5) intoxication while on duty.  53 Pa. Con. Stat. § 812.  The Act further provides that a " written statement of any charges made against any person so employed shall be furnished to such person within five days after the same are filed."  Id.  While the Act stops short of specifying with whom such a statement should be filed, courts have generally found that charges should be filed with the appointing authority, which, in this case, would have been the Supervisors.  See, e.g., Bor. of Riegelsville v. Miller, 639 A.2d 1258, 1259-260 (Pa. Commw. Ct. 1994) (charges filed with borough council); see also John B. Mancke, Removal, Suspension or Demotion of a Municipal Police Officer: A Review and Analysis, 79 Dick. L. Rev. 380, 389 (1974–1975) (governing body).  Because Point Township could not suspend, remove, or demote full-time police officers except for the reasons enumerated in the Act, Plaintiff, as a full-time sergeant, had a property interest in his position of employment with the township's police department.

In his complaint, Plaintiff alleges that he elected to take administrative leave during a meeting with the Supervisors, described in his complaint as follows:

> On November 14, 2005, Plaintiff Sergeant Seth Cotner met with all five Township Supervisors and the Solicitor in a closed door meeting.

16

During his closed door meeting, the Township Supervisors made numerous false and baseless allegations against Plaintiff Sergeant Seth Cotner, including accusing him of alcoholism and threats of violence against his ex-wife. The Township Supervisors threatened to terminate Plaintiff Sergeant Seth Cotner's employment based on charges unbecoming an officer unless he agreed, at that very moment, to take an administrative leave effective immediately. Although Sergeant Cotner requested to speak to an attorney about the threatened charges and get back to the Supervisors on the very next day, the Supervisors told him that if he did not take the administrative leave at that meeting, charges would be prepared and they would begin the process of terminating his employment. Feeling he had no other choice and desiring only to clear his name, Plaintiff Sergeant Seth Cotner felt compelled to go on administrative leave.

(Compl. ¶¶ 35-39.)  Plaintiff took administrative leave directly after the meeting and, approximately ten months after returning to duty, notified the Township of his intention to retire. (Id. ¶¶  40, 49, 69.)

As the foregoing description makes clear, the Supervisors gave Plaintiff two distinct options:  Take administrative leave, effective immediately, or submit to formal termination proceedings.  "[D]esiring only to clear his name," Plaintiff deliberately and knowingly chose the former, foregoing the protections and remedies of the Act.  See, e.g., Ambrose v. Dupont Bor., 33 Pa. D. & C.3d 362, 371 (Pa. Ct. Com. Pl. 1984) (sustaining defendants' demurrer where, "[u]nfortunately for plaintiff,  [he] ignored the readily available remedy of appeal afforded by both the civil service provisions of the borough code and the like provisions of the Police Tenure Act."); cf. Twp. of Falls v. Whitney, 730 A.2d 557, 561 (Pa. Commw. Ct. 1999). (holding that, where plaintiff "was informed that he was subject to internal discipline, and asked to choose between the Police Tenure Act and grievance arbitration, [and] deliberately and knowingly elected to proceed under the Police Tenure Act," plaintiff had waived his right to grievance

arbitration).  In the words of the Third Circuit, "[i]f there is a process on the books that appears

to provide due process, the plaintiff cannot skip that process and use the federal courts as a

means to get back what he wants."  Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000).  Plaintiff

may indeed have "felt compelled to go on administrative leave," but the Supervisors did not, as

Plaintiff now claims, "force him into taking an administrative leave."  (Doc. No. 13, at 16.)

Furthermore, there is nothing in the record to suggest that taking administrative leave left

Plaintiff any less able "to speak to an attorney about the threatened charges and get back to the

Supervisors on the very next day."  (Compl. ¶ 38.)  Nor is there any indication that Point

Township or the Supervisors had any intention of skirting their obligations under the Act.

Rather, as Plaintiff attests, "the Supervisors told him . . . *charges would be prepared* and they

would begin the *process of terminating his employment*," exercising their lawful prerogative.

(Compl. ¶ 38 (emphasis added).)  The Act does not deprive Point Township or the Supervisors of

the power to suspend or remove an officer such as Plaintiff, "but merely prescribes and limits the

conditions under which these powers may be exercised."  Masemer v. Bor. of McSherrystown,

34 Pa. D. & C.2d 669, 672 (Pa. Ct. Com. Pl. 1964).

   In his brief in opposition, Plaintiff asserts that the individual defendants "secured a

constructive termination of his employment" in violation of his due process rights by "removing

all of his Sargent [sic] duties from him (effectively reducing his rank) without affording him

statutory rights to challenge such demotion, and making the circumstances of his employment

which including [sic] a defacto [sic] reduction in rank and reducing his duties to that of a

probationary officer."  (Doc. No. 13, at 14.)  Specifically, Plaintiff alleges that Brown "took

administration of the D.A.R.E. Program away from [him;] took all scheduling responsibilities

away from [him;] removed [his] name from the 'approved' section of reports and replaced it with his own name[;] removed all responsibilities for the evidence room from [him;] took [his] computer[;] would not permit [him] to attend any classes, seminars or continuing education" (Compl. ¶¶ 53, 56-60); would not permit him to take a police vehicle home on his days off (see id. ¶ 61); "refused to permit [him] to assist the Sunbury Police Department . . . in the selection of a K9 Officer [; and] required [him] to work far more night shifts than any other officer in the department (id. ¶¶ 62, 64)."  In addition, Plaintiff alleges that Brown and the Supervisors "disseminated false information to members of the public to the effect that [he] was a drunk who had threatened harm against his his [sic] ex-wife."  (Id. ¶ 65.)  Plaintiff concludes by stating that "the removal of all of [his] 'Sergeant' duties upon his return to work after his leave of absence stripped him of all rights and responsibilities attendant with [sic] his Sergeant rank and was tantamount to a demotion."  (Id. ¶ 67.)  As with nearly all of his arguments, Plaintiff sows the seeds of his discontent in a legal barrens, citing not a single case in support.

In Clark v. Township of Falls, 890 F.2d 611 (3d Cir. 1989), the Third Circuit Court of Appeals considered the question of whether and under what circumstances Pennsylvania law would recognize a claim of constructive demotion if the change in an officer's circumstances was in fact comparable to reduction in rank.  Id. at 618.  Noting that there was "no Pennsylvania case that interprets the Police Tenure Act in an analogous situation, nor . . . any helpful legislative history," the court tentatively surmised that Pennsylvania law would recognize such a claim and that, where the officer's job title was unchanged, courts should look to the traditional indicia of change in rank to determine whether an  employee's rank was constructively reduced. Id. at 618.  Of these indicia, the court attached the greatest significance to a change in pay.  Id.

"Other indicia may be the imposition of duties normally given to employees of a lower rank,

substantially reduced responsibilities, termination of privileges of rank, and whether the changes

or restrictions are temporary."  Id.  The court subsequently held that, as a matter of law and

notwithstanding the jury's verdict to the contrary, the officer in question had not suffered a

constructive reduction in rank.  Id.  In so holding, the court observed that, although the officer

"clearly did not like the changes in his duties" and had experienced "genuine distress," he had

retained not only his rank but also his salary and, despite losing many of his duties, "was not left

without any job functions."  Id.

Two years after Clark, the Commonwealth Court of Pennsylvania demonstrated a less

conservative approach when it held that changing an officer's work shift from night to day,

reducing her salary by more than $1000, and prohibiting her from serving as acting sergeant did

not constitute a constructive suspension or demotion sufficient to warrant a hearing under the

Act.  Terzuolo v. Bd. of Supervisors of Upper Merion Twp., 586 A.2d 480, 482

(Pa. Commw. Ct. 1991).  Even on the undeveloped record now before the Court, the holdings in

Clark and Terzuolo leave little question that Plaintiff, who retained his rank and salary and,

despite losing some of his duties, held something other than a sinecure, was not constructively

demoted.

As to whether Plaintiff's resignation was tantamount to termination, the inquiry in this

circuit is an objective one: "Did working conditions become so intolerable that a reasonable

person in the [Plaintiff's] position would have felt compelled to resign?"  Hill v. Bor. of

Kutztown, 455 F.3d 225, 233 n.7 (3d Cir. 2006) (citing Pennsylvania State Police v. Suders,

542 U.S. 129, 141 (2004).  It would be inappropriate, however, for the Court to decide such a

fact-intensive question in the context of a 12(b)(6) motion.  Id.  Thus, for the purpose of the instant motion, the Court will accept what Plaintiff alleges, namely, that he was constructively discharged.

Assuming then that Plaintiff was either constructively demoted, constructively discharged, or both, Plaintiff was entitled to "some kind of a hearing" prior to the deprivation of any protected property interest in his employment.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, (1985) (quoting Board of Regents v. Roth, 408 U.S. 564, 569-570 (1972)); but see Rossiter v. Whitpain Tp., 170 A.2d 586, 587 (Pa. 1961) (holding that, under the Police Tenure Act, only officers who are suspended or removed from employment are entitled to a hearing, not officers who are demoted or reduced in rank).  "Such a hearing need not be elaborate, but rather 'an initial check against mistaken decision-essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'"  Homar v. Gilbert, 89 F.3d 1009, 1014 (3d Cir. 1996) (quoting Loudermilk, 408 U.S. at 545-46).  Specifically, a tenured public employee such as Plaintiff is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and "an opportunity to present his side of the story."  Loudermill, 470 U.S. at 546.  Lack of advance notice does not constitute a *per se* violation of due process.  Gniotek v. City of Philadelphia, 808 F.2d 241, 244 (3d Cir. 1986)  "A brief face-to-face meeting with a supervisor provides sufficient notice and opportunity to respond to satisfy the pretermination due process requirements of Loudermill."  West v. Grand County, 967 F.2d 362, 368 (10th Cir. 1992); see also Gniotek, 808 F.2d at 244-45 (holding that a brief face-to-face meeting between a police officer and his supervisor, convened without advanced notice, satisfied the demands of

due process).  "To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." Loudermill, 470 U.S. at 546.

There can be no doubt that the closed-door meeting between Plaintiff and the Supervisors on November 14, 2005, satisfied the minimal pre-deprivation requirements of Loudermill.  By Plaintiff's own account, the Supervisors gave him oral notice of the prospective charges, which included conduct unbecoming an officer, one of the five reasons for removal enumerated in section 812 of the Act.  (Compl. ¶ 37 ("The Township Supervisors threatened to terminate Plaintiff Sergeant Seth Cotner's employment based on charges [sic] unbecoming an officer.").) Furthermore, the Supervisors did not deny Plaintiff "an adequate explanation of the evidence." Loudermill, 470 U.S. at 546.  On the contrary, "the Township Supervisors made numerous . . . allegations against Plaintiff, including . . . alcoholism and threats of violence against his wife."  (Compl. ¶ 36.)  Plaintiff's opinion of those allegations—that they were "false and baseless"—does nothing to alter their evidentiary character.  Finally, there is not the least indication that the Supervisors refused him "an adequate opportunity to present his side of the story."  Loudermill, 470 U.S. at 546.  Rather, "desiring only to clear his name," Plaintiff elected to take administrative leave, executing the necessary paperwork then and there. (Compl. ¶ 39-40.)

For the foregoing reasons, the Court finds that the closed-door meeting between Plaintiff and the Supervisors on November 14, 2005, satisfied the demands of due process.  See, e.g., Wagner v. Tuscarora Sch. Dist., No. 04-1133, 2006 WL 167731, at *7 (M.D. Pa. Jan. 20, 2006) (holding that an informal closed-door meeting between plaintiff, union officials, and his

supervisor, during which the supervisor told plaintiff that he could "resign his position

voluntarily or face termination proceedings," and after which  plaintiff agreed to be placed on

unpaid administrative leave, did not constitute a violation of plaintiff's due process rights), aff'd

225 F. App'x 68 (3d Cir. 2007).  Accordingly, the Court will dismiss Count II of Plaintiff's

complaint.

> ### G.    Count IV: Civil Conspiracy in Violation of 42 U.S.C. § 1983 by the Individual Defendants

In Count VI of his complaint, entitled "42 U.S.C. § 1983 Conspiracy," Plaintiff contends

that the individual defendants "conspired to force [him] to take a leave of absence and to make

working conditions so intolerable for the [him] that he was forced to resign," and "as a direct and

proximate result of the Defendant's actions and omissions, [he] has suffered emotional distress,

mental anguish, stress and inconvenience."  (Compl. ¶¶ 98, 100.)  In terms of relief, Plaintiff

seeks compensatory damages, punitive damages, back pay, front pay, and attorney fees.  (Id.

¶ 101.)  The individual defendants argue that the allegations in Plaintiff's complaint are

insufficiently particularized to support a claim of conspiracy and, more fundamentally, that a

§ 1983 conspiracy claim is not actionable in the absence of a § 1983 violation.  (Doc. No. 9,

at 18 (citing Barkauskie v. Indian River Sch. Dist., 951 F. Supp. 519, 539 (D. Del. 1996)).

Plaintiff's response is brief in the extreme and essentially ignores the relevant legal issues:

> Defendants' [sic] contend that Plaintiff's Complaint fails to contain
> sufficient factual allegations of an agreement or understanding among
> Defendants or co-conspirators, to plan to carry out the alleged chain
> of events.   To the contrary, the detailed factual allegations of
> Plaintiff's Complaint, with all reasonable inferences viewed in a light
> most favorable to Plaintiff, states a viable cause of action for a
> conspiracy in violation of 42 U.S.C. § 1983.  If the Court believes
> additional, more detailed factual allegations are required, Plaintiff

>will gladly file an Amended Complaint containing more detailed
>factual allegations.

(Doc. No. 13, at 16.)

Civil conspiracy is not by itself an element of a § 1983 claim.  See 42 U.S.C. § 1983.

Rather, civil conspiracy is merely a "vehicle by which § 1983 liability may be imputed to those

who have not actually performed the act denying constitutional rights."  PBA Local No. 38 v.

Woodbridge Police Dept., 832 F. Supp. 808, 832 n.23 (D.N.J. 1993) (citing Pfannstiel v. City of

Marion, 918 F.2d 1178, 1187 (5th Cir.1990)).  A conspiracy claim is therefore not actionable

without an actual violation of § 1983.  See Pfannstiel, 918 F.2d 1187; cf. Dykes v. Se. Pa.

Transp. Auth., 68 F.3d 1564, 1570 (3d Cir.1995) (stating that the court need not reach the issue

of conspiracy because plaintiff's complaint failed to allege cognizable violation of his due

process rights).  To succeed on his claim, Plaintiff must prove both the deprivation of a

constitutional right and the existence of a conspiracy to deprive that right.  Thompson v. City of

Lawrence, 58 F.3d 1511, 1517 (10th Cir. 1995).  As previously discussed, Plaintiff has failed to

establish the existence of an underlying constitutional injury.  Accordingly, the Court will

dismiss Count IV of Plaintiff's complaint.

### G.    Count IX: Defamation by the Individual Defendants

In Count IX of his complaint, Plaintiff attempts to brings a claim for defamation against

the individual defendants, alleging that both Brown and the Supervisors, acting in their official

capacity, falsely accused him of being an alcoholic and of threatening to harm his ex-wife.

(Compl. ¶¶ 125, 129.)  Plaintiff further alleges that the individual defendants disseminated those

accusations to the public, "beyond their privilege, . . . in an effort to discredit [him] in the

community."  (Id. ¶¶ 128, 131; see also id. ¶¶ 65, 130.)  The individual defendants argue that

they, as high public officials, are immune to all civil suits for damages arising out of such statements, even those motivated by malice.  (Doc. No. 9, at 31-32.)  Plaintiff counters that "[t]his protection may actually have been available to the individual Defendants had they kept their defamatory allegations 'in house,'" (Doc. No. 13, at 16) but, because they "intentionally published their defamatory statements to the public," the doctrine of absolute privilege can offer them no protection (Id., at 17).  Plaintiff further argues that Brown, as a patrolman and later as chief of police, was not a high public official entitled to absolute immunity.  (Id., at 17.)

In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion.  42 Pa. Cons. Stat. Ann. § 8343(a).  "Special harm" is shown by proof of specific monetary or out-of-pocket losses caused by the defamation.  See Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp.2d 570, 580 (E.D. Pa. 1999) (citing Restatement (Second) of Torts, § 575 (1977)).  In Pennsylvania, however, a plaintiff may succeed in a claim for defamation absent proof of special harm where the words spoken constitute slander *per se*. Clemente v. Espinosa, 749 F. Supp. 672, 677 (E.D. Pa. 1990).  Words that impute a criminal offense, a loathsome disease, business misconduct, or serious sexual misconduct are slander *per se*.  Restatement (Second) of Torts, § 570 (1977).  "Whether the words allegedly used by a defendant were [slander] *per se* is . . . a question for the court."  Synygy, Inc., 51 F. Supp. 2d at 580.

Here, Plaintiff alleges that the individual defendants published defamatory statements to the effect that he was an alcoholic and had threatened to harm his ex-wife.  Whether those statements rise to the level of slander *per se* is an open question at so early a stage in the proceedings.  However, accepting all factual allegations and inferences as true, the Court finds that Plaintiff has sufficiently pled a cause of action for defamation against the individual defendants.  To the extent that those statements are shown to have been in fact closely related to the performance of official duties, the individual defendants, with the exception of Brown in his capacity as a patrolman, are entitled to absolute immunity, regardless of their personal or political motives.  See Jonnet v. Bodick, 244 A.2d 751, 753 (Pa. 1968) (holding that "Supervisors are within the class of 'high public officials' protected by absolute privilege"); Zdaniewicz v. Sands, 288 Pa. Super. 420, 432 A.2d 231 (Pa. Super. Ct. 1981) (holding that township supervisors enjoyed absolute immunity from suit by police officer for alleged defamatory statements made during a meeting, regardless of "the circumstances and motivations of [their] actions, so long as they are taken within the parameters of [their] official dut[ies]"); Lancie v. Giles, 572 A.2d 827, 830 (Pa. Commw. Ct. 1990) (holding that police officers "are not entitled to statutory sovereign immunity"); Ammlung v. City of Chester, 53 Pa. D. & C.2d 169, 172 (Ct. Com. Pl. 1971) (holding that the "posts of mayor and chief of police fall into the class of 'high public officials'"); but see id. ("As to the liability of police officers for injurious acts committed in the performance of their duties, the law is not clear.").

Having found that Plaintiff has sufficiently pled a cause of action for defamation against the individual defendants, the question turns to whether the Court should retain supplemental jurisdiction over this solitary state law claim.  Federal courts may exercise pendent jurisdiction

over state-law claims when "state and federal claims . . . derive from a common nucleus of operative fact." <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966).  The United States Supreme Court has long counseled that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." <u>Id.</u> at 726.  As a matter of comity, needless decisions of state law should be avoided.  <u>Id.</u>  "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." <u>Id.</u>  Because all of Plaintiff's federal claims are to be dismissed, the Court declines to exercise pendent jurisdiction over Plaintiff's state law claim of defamation.  Accordingly, the Court will dismiss Count IX of Plaintiff's complaint.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion to dismiss Plaintiff's complaint in its entirety.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SETH M. COTNER,** | : | |
| | : | |
| **Plaintiff** | : | **Civil Action No. 1:07-cv-1566** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **RANDALL W. YOXHEIMER et al.,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

**AND NOW**, on this 2nd  day of July, 2008, upon due consideration of Defendants' motion to dismiss (Doc. No. 8) Plaintiff's complaint, and for the reasons set forth in the memorandum filed herewith, **IT IS HEREBY ORDERED THAT** Defendants' motion (Doc. No. 8) is **GRANTED**.  The Clerk of Court is directed to enter judgment for Defendants and close this case.


 S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania